LAW OFFICES OF ROBERT L. TARVER, JR.
66 South Main Street
Toms River, New Jersey 08757
Tel: (732) 341-2152
Fax:(732) 341-2153
Robert L. Tarver, Jr., Esq.
Attorney for Plaintiffs
RT (0472)

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| BLACK PARENTS WORKSHOP, a New Jersey Not for Profit Corporation, Parent S.F. on behalf of A.F., a minor; Parent D.I. on behalf of J.I., a minor; Parents E.M. and J.M. on behalf of M.M., a minor; Parent R.J. on behalf of S.J., a minor; Parent B.J. on behalf of A.J., a minor. | : : : : : : | Civil Action No.2:18-cv-02726 JMV-JBC |
| Plaintiffs, | : | *Civil Action* |
| v. | : | **FIRST AMENDED COMPLAINT AND JURY DEMAND** |
| THE SOUTH ORANGE MAPLEWOOD SCHOOL DISTRICT, JOHN AND JANE DOES 1-20 | : : | |
| Defendants. | : | |

Plaintiffs, by way of First Amended Complaint against Defendant SOMSD says:

## INTRODUCTION AND INITIAL STATEMENT OF CLAIM

This Complaint is brought on behalf of the Black Parents Workshop, a New Jersey not for profit corporation whose members are the parents of children currently enrolled in primary and secondary schools in the South Orange Maplewood School District (hereinafter "SOMSD" or "The District"); Parent S.F. on behalf of A.F., a minor;

1

Parent D.I. on behalf of J.I., a minor; Parent E.M. on behalf of M.M., a minor; and Parent R.J. on behalf of S.J., a minor; Parent B.J. on behalf of A.J., a minor.

The Plaintiffs allege that the SOMSD, through the use of academic tracking, racially applied academic policies, racial segregation of school facilities, out of school suspensions and disparate disciplinary measures, has violated Title I of the Elementary and Secondary Education Act of 1965, 20 U.S.C. §6301 et seq., Title VI of the Civil Rights Act of 1964, 42 USC § 2000d, et. seq., Section 504 of the Rehabilitation Act of 1973, 29 USC §794, 42 USC §1983, New Jersey's Law Against Discrimination, N.J.S.A. 10: 5-1, et. seq., and the New Jersey Constitution.

In or about 2012, the U.S. Department of Education Office of Civil Rights (OCR) began an investigation and review of the SOMSD for discriminatory practices. The review addressed whether African American students were provided equal access to and an equal opportunity to participate in rigorous college and career preparatory courses within the District. Concurrently, in October of 2014, the American Civil Liberties Union of New Jersey (ACLU), the ACLU Racial Justice Program, the Center for Civil Rights Remedies at the Civil Rights Project of U.C.L.A. and two individual Plaintiffs filed a Complaint with the Office of Civil Rights (OCR) alleging that the use of academic tracking and the frequent use of out of school suspensions violated Title VI of the Civil Rights Act of 1964 and Section 504 of the Rehabilitation Act of 1973 in that their use effectively discriminated against African American and disabled students. The Complaint set forth in great detail, statistical data which served as summary proof of the

2

District's clear violation of these statutes. (See ACLU Complaint, attached hereto as **Exhibit A**)

As a result of discriminatory practices identified by the OCR and those identified in the ACLU Complaint, the District opted to enter into a Resolution Agreement under OCR Docket No. 02-13-5003. (See OCR Resolution Agreement attached hereto as **Exhibit B**).

Of its own volition, the District agreed to certain conditions to remedy discrimination within the District. In doing so, there was an obvious and overt recognition that the District was deficient and in need of corrective action. The Resolution Agreement provided for the District to engage in specific remedial action through specified "Action Steps."

Since the inception of the Agreement, however, it has become abundantly clear that the District has taken little or no steps to meet its obligations under the Agreement and has no intention of doing so. It has willfully and flagrantly violated the terms and conditions of the Resolution Agreement as set forth in this Complaint.

As a result, there has been no correction to the discriminatory conditions which were identified by the OCR and the ACLU in 2013 and 2014. In fact, current statistical data suggests that conditions have actually deteriorated. For its part, the District has not only failed to comply with the Agreement but has actively acted to deceive the taxpayers

3

of Maplewood and South Orange as to its compliance. Moreover, members of the Administration and Board of Education maintained a pattern and practice of discriminatory acts against African American students of which they were fully aware but did nothing to resolve.

A review of data demonstrates that the SOMSD continues to use academic tracking which has harmed and continues to harm African American and disabled students. The District continues to disproportionately discipline and suspend African American students at a rate much higher than their White counterparts for the same offenses. In addition, the District allows racially based selective policies for restricting the admission of African American students to upper level classes. Individual Plaintiffs within this Complaint have been subjected to the effects of discriminatory tracking, leveling, the racially enforced restrictions on leveling up and racially imposed discipline as well as failure to protect the rights of children with disabilities.

The effects of the policies promulgated by the SOMSD have been open, notorious and obvious to all parties involved. The Supervisory Body of the District is and has been aware of the discriminatory nature of the District's policies. Board Member Maureen Jones publicly stated:

> "We talk a lot about diversity in our community, and how everyone moves here for the diversity, but we look at our classrooms, particularly at our middle schools and our high school, and we see a lot of institutional segregation. And, how can diversity and institutional segregation co-exist." [Statement made at SOMSD Board Meeting 10/16/2017]

4

Board member Stephanie Lawson-Muhammad openly questioned the morality surrounding the creation and maintenance of discriminatory levelling within the District:

> "But at the end of the day, we sit in a district that was built on a moral compass, that I think, we all can question. We didn't get hyper-levels that don't exist in surrounding communities by accident. It was very specifically engineered. What we sit on in this district was engineered the way it was, on purpose." [Statement made at SOMSD Board Meeting 10/16/2017]

Superintendent Thomas Ficarra publicly acknowledged the existence of segregation in the District as well as the failure of the administrative body to act:

> "We have open and visible segregation, in the elementary schools and classroom segregation at the high school level. We have to stop finding reasons to delay. It's time to snap out of analysis-paralysis." [Statement made at SOMSD Board Meeting 2/20/2018]

More than fifty years after *Brown v. Board of Education*, there is clear and undisputable evidence of racial segregation in the District's schools. It has been acknowledged by Board members and the Superintendent. Statistics as set forth in this Complaint clearly demonstrate that elementary schools are racially segregated for no compelling legitimate reason. Racially separative polices, racially disparate academic leveling and racially disproportionate disciplinary practices, as used by the SOMSD, violate Federal and State law. This Complaint details the Background and History of discriminatory practices in the SOMSD and, as in *Brown v. Board of Education,* provides the statistical data and social science which supports the contention that the SOMSD has engaged in and continues to engage in discriminatory practices contrary to Federal and State law and forms the basis for equitable and monetary relief.

# TABLE OF CONTENTS

INTRODUCTION......................................................................................... 1

JURISDICTION AND VENUE ................................................................... 8

THE PARTIES.............................................................................................. 8

PLAINTIFF BLACK PARENTS WORKSHOP ........................................ 8
PLAINTIFF S.F ......................................................................................... 9
PLAINTIFF D.I ....................................................................................... 10
PLAINTIFFS E.M AND J.M................................................................... 11
PLAINTIFF R.J… ................................................................................... 13
PLAINTIFF B.J….....................................................................................14

BACKGROUND ....................................................................................17

1. USING 'DIVERSITY' TO PRESERVE THE RACIAL STATUS QUO...........................17
2. HISTORICAL AND LEGAL BACKGROUND OF SCHOOL SEGREGATION IN NJ.................. 21

FACTUAL ALLEGATIONS.................................................................. 23

A. SOMSD HAS MAINTAINED A SYSTEM OF DE FACTO SEGREGATION.............................. 23
B. HISTORY OF 'ABILITY GROUPING' AND 'LEVELING'.................................................... 30
C. CURRENT STATE OF TRACKING AND LEVELING IN SOMSD.......................................... 37
D. SOMSD'S RACIALLY DISCRIMINATORY PRACTICES ................................................ 51
E. RACIALLY DISPARATE DISCIPLINE IN THE SOMSD ....................................................... 56

EVIDENCE OF SOMSD'S INSUFFICIENT REMEDIES TO ADDRESS RACIAL DISPARITIES ...................................................................................... 60

A. SOMSD HAS UNDERMINED ITS OWN POLICIES ...................................................... 60
B. SOMSD FAILED TO COMPLY WITH AN OCR RESOLUTION AGREEMENT........................ 62
C. SOMSD HAS RESISTED OFFERS OF ASSISTANCE ......................................................... 65

SUMMARY OF SOMSD ACTIONS/OMISSIONS .............................. 69

COUNTS OF THE COMPLAINT ......................................................... 72

PRAYER .................................................................................................. 76

JURY DEMAND ..................................................................................... 79

APPENDIX................................................................................................ 1

A. EXHIBIT A: ACLU-NJ OCR COMPLAINT V. SOMSD..................................................... 3
B. EXHIBIT B: SOMSD OCR RESOLUTION AGREEMENT (OCR DOCKET NO. 02-13-5003) ... 47
C. EXHIBIT C: BIBLIOGRAPHY ON TRACKING AND ABILITY GROUPING ........................... 59
D. EXHIBIT D: BLACK PARENTS WORKSHOP CORRESPONDENCE TO BOE ......................... 66
E. EXHIBIT E: SLIDES FROM SUPERINTENDENT'S PRESENTATION – FEB. 20, 2018 ......... 74
F. EXHIBIT F: COLUMBIA HIGH SCHOOL ALUMNA FACEBOOK POST ............................... 84
G. EXHIBIT G: LEVEL 3- ALGEBRA I HOMEWORK ASSIGNMENT....................................... 86
H. EXHIBIT H: ACCESS & EQUITY, & ACADEMIC PLACEMENT POLICIES - SOMSD............. 88
I. EXHIBIT I: BLACK PARENTS WORKSHOP'S CORRESPONDENCE TO BOE PRESIDENT...... 92
J. EXHIBIT J: ARCHIVAL NEWSPAPER ARTICLES ............................................................ 96
K. TABLE I: HISTORICAL TABLE – MINORITY STUDENT ENROLLMENT, SOMSD.............. 132
L. TABLE II: RACIAL PROFILE OF SOMSD SCHOOLS ...................................................... 133

A.   TABLE III: RACIAL COMPOSITION OF SOMSD STAFF ................................................... 134
B.   TABLE IV: SOMSD COURSE ENROLLMENT BY RACE ................................................ 135
C.   TABLE V: PARCC SPRING 2017 – LANGUAGE ARTS, GR-3 ........................................ 139
D.   TABLE VI: PARCC SPRING 2017 – GR-5, MATHEMATICS............................................ 140
E.   TABLE VII: PARCC SPRING 2017 – GR-8, MATHEMATICS ........................................ 141
F.   TABLE VIII: PARCC SPRING 2017 – LANGUAGE ARTS, GR-8 .................................... 142
G.   TABLE IX: PARCC SPRING 2017 – ALGEBRA I ...................................................... 143
H.   TABLE X: PARCC SPRING 2017 – ALGEBRA II ....................................................... 144
I.   TABLE XI: PARCC SPRING 2017 – LANGUAGE ARTS, GR-9 .. ............................145

## JURISDICTION AND VENUE

1.        The jurisdiction of this Court is invoked pursuant to 20 U.S.C. §6301 (Title I), 42 U.S.C. § 2000d-2000d-7 (Title VI), 42 U.S.C. §1983, 29 U.S.C.§ 794 (Section 504) 20 USC§ 33 (IDEA) and the supplemental jurisdiction of this Court over state claims. Venue is proper within this District because the unlawful practices complained of in this complaint all occurred within the District of New Jersey.

2.        The causes of action alleged, seek to redress the deprivation, under the color of state law, policy and custom, of rights secured by the United States Constitution, the New Jersey Constitution, and the statutory and common laws of the State of New Jersey, and to recover damages, costs, and attorney fees under 42 U.S.C. §§ 1983, 1985(1), (2), (3) and 1988.

3.        The acts, omissions and conspiracies alleged in this complaint were engaged in and carried out by the defendant under color of state law and/or agents, employees and assignees of the South Orange-Maplewood School District (SOMSD), through their employees, agents, officials and co-conspirators pursuant to governmental policy, practice, and custom and under color of law.

## THE PARTIES

4.        Plaintiff Black Parents Workshop (BPW) is a not for profit entity, organized under the laws of the State of New Jersey. It is a public policy advocacy organization and

8

adult organizing collective dedicated to the educational success and cultural grounding of children of African descent in the neighboring communities of South Orange and Maplewood, New Jersey. The Workshop serves to support students in the South Orange-Maplewood public school district who identify as African-American, Caribbean or African, and the parents or guardians of this student population. Members of this group are the parents of students who attend schools within the SOMSD.

The Black Parents Workshop has, for the last four years, monitored the actions of the District including, but not limited to, the District's compliance with the OCR Resolution Agreement. In addition, the BPW has been the recipient of numerous parental complaints regarding the discriminatory actions of the District and has interceded and responded to those actions both organizationally and through its legal counsel.  The Black Parents workshop, in advocating for African American students has actively sought to engage the SOMSD to fulfill its commitment to African American students by adhering to its commitment under the Resolution Agreement. The BPW has proposed numerous actions toward remediation of systemic discrimination and has even voluntarily offered assistance. The SOMSC, however, has repeatedly rejected the efforts of the BPW.


7.       Plaintiff S.F. was at all times relevant, the parent of A.F., a student attending Columbia High School in the SOMSD and is a taxpayer in the Township of Maplewood. A.F. is a student of African American descent. A.F. is a student who is in Honors classes. He has no disciplinary history and is a teaching assistant for History classes. As an African American male, the system of tracking and levelling has had an impact on him

since he is, in many respects, separated from other African American students who should be given access to advanced courses. As such, he is and continues to be denied a diverse educational experience.

During one of his classes, A.F. happened to fall asleep because he had been up late at night. His teacher determined that he should be drug tested. He was sent to the nurse's office. He exhibited no clinical symptoms of drug use, nor did he meet the critical criteria indicating drug use. Nonetheless, the district required that he be suspended from school pending a drug test. A.F. was drug tested with negative results. He was then permitted to return to the school. A.F., however, was humiliated by the experience. His peers were aware of the incident, which caused him great embarrassment. Other students who were White had previously fallen asleep in class and were not subjected to drug testing requirements. The incident experienced by A.F. is indicative of SOMSD's policy and practice of targeting and disproportionately disciplining African American students.

8.      Plaintiff D.I. was at all times relevant the parent of J.I.., a student attending Columbia High School in the SOMSD and a taxpayer in the Township of Maplewood. J.I. is an African American male attending the Columbia High School. On November 7th, 2017, while in class, J.I. was asked a question by his teacher. J.I. answered the questions posed to him correctly. The teacher appeared to be frustrated with his answer and noticing the look on her face, the other students began to laugh. J.I., as a typical fifteen-year old, joined in the laughter as well.

When the class ended, J.I. proceeded to his next class. Within 15 to 20 minutes into his next class, J.I. was removed from class by Vice Principal Woolard. J.I.

had no idea as to what was transpiring. He was then escorted by the Vice Principal to the school's nurse's office. At that time, he was forced to undergo testing for marijuana, despite the fact that he met none of the school's criteria for suspicion of being under the influence of drugs.  The testing proved negative and J.I. was confirmed not to be under the influence of the suspected drug. Unfortunately, the harassment did not end there. J.I. was then escorted to his locker by the same administrator along with a school employed security-officer, and then searched. The search yielded no evidence of illegal drugs but thoroughly humiliated J.I. These two acts mentioned above have now severely traumatized J.I. emotionally and he has suffered damage. The incident experienced by J.I. is indicative of SOMSD's policy and practice of targeting and disproportionately disciplining African American students.

9.      Plaintiffs E.M. and J.M. are the parents of M.M. M.M. is a White male and has been a student in the district since he was in preschool. He had an Individual Education Plan (IEP) for speech and motor issues and was declassified after 1st grade. The district promised his parents during the declassification process that M.M. would be put into an inclusion class so that he could be monitored by the special education teacher and given additional support when needed. The district, however, did not follow through with its commitment to M.M. He had a teacher that year that was not supportive and that led to him having issues, including persistent bullying by other students and constantly being in trouble with the teacher for behavior issues. After an incident in the class, his parents met with the school administration, and he started to receive help from the school's social workers, and he was put into a social work group. His teacher was

subsequently moved to the 4th grade after numerous complaints from parents. M.M. was subsequently diagnosed with ADHD in 4th grade and was provided with a 504. Throughout his middle school years, his parents repeatedly fought with the district to make sure his 504 was properly enforced and that he received his legally entitled supports. Although his 504 required that he be given extra time for school work, SOMSD refused to comply. M.M. was to be supplied with a computer under the 504. SOMSD refused to comply and as a result, he went for extended periods without the equipment he needed to be successful.  M.M.'s parents had to hire an attorney to force the District to comply.

As part of his approved 504, M.M. was to receive medication during the day. As a result of the failure of the school to comply with State law, the school failed to give him his medication for more than a month. The District has repeatedly failed to adhere to the conditions of M.M.'s 504. The District has acknowledged that they were in violation of Special Education law and their own 504 policy. Prior to his enrollment in Columbia High School, M.M.'s parents had a transition to high school meeting specifically to address his 504. During the current school year (2017-2018), M.M. has faced difficulty in the classroom due to the failure of the SOMSD to provide adequate resources and to meet the conditions of his 504. As a result, M.M. has suffered academically.

M.M. has been placed in a class where he is not challenged academically. At one point, M.M. was given a homework assignment in his Columbia High School Algebra I ('Level 3') 'College Preparatory' class from a Scholastic Magazine math exercise that is more appropriate for children in elementary school. This magazine was often used by his teacher in a class-level the SOMSD purports prepares students for college study.

12

Moreover, due to the racially discriminative policies of the SOMSD, M.M. has been deprived of his ability to interact with diverse students since he, like African-American students, is being warehoused in a lower-level course as a result of the school district's practice of tracking students. As a result, he has suffered damage.

10.     Plaintiff R.J. is the parent of S.J. a student in Columbia High School and is a taxpayer in the Township of Maplewood. S.J. is a tenth-grade student. Beginning in the 2017-2018 school year, S.J. was enrolled in the College Prep tracking level for Geometry. In September of 2018, S.J. immediately recognized that many of the concepts being taught were those to which she had been exposed to at the grade school level. R.J. contacted Columbia High School in an effort to have his child move into an appropriately challenging geometry class.

Upon contacting the school, he was told that the school could not honor requests to change levels. Essentially, R.J. was told that his daughter had no option but to remain in a class where she was academically unchallenged. This information, however, was patently false. In fact, Columbia High School regularly allowed White students to "level up" from a lower class level to a higher one. There was no legitimate reason for S.J. to have been denied the ability to change classes, especially since White students were permitted to do so.

Following intervention from the Black Parents Workshop, the school ultimately allowed S.J. to level up. Currently, she is thriving in Honors Geometry, Honors Physics, Honors American History and Honors Art History. The incident

experienced by S.J. is indicative of SOMSD's discriminatory policies and practices of leveling imposed upon African American students.

11.        Plaintiff B.J. is the parent of A.J., a student in Columbia High School and a taxpayer in the Village of South Orange. A.J. is an 11th grade student having received a designation as a disabled student. He was given an Individual Education Plan (IEP), in 2009. Under this IEP, he received assistance to aid him in his academics consistent with his disability.    When he entered the 4th Grade A.J. scored Advanced Proficient in Mathematics (250) and Science (296) out of a possible 300 score on the NJ ASK (New Jersey Assessment of Skills and Knowledge) test. The scale for a score of Advanced Proficiency was 250-300. A.J. scored Proficient in Language Arts with a score of 234. The scale for a score of Proficiency was 200-249. A.J. was just 4 points from a perfect score in Science.

Without warning and following his performance on NJ ASK, the school district declassified Anthony and pulled his Individual Education Plan (IEP). There was no indication that the IEP was unwarranted.  As a result, in 5th A.J. dropped 43 points in math from the prior year. The scale for a score of Proficiency was 200-249. He scored Proficient in Language Arts with a score of 170, but that was a drop of 64 points from the previous year. He was then re-evaluated by the district's Department of Special Services Child Study Team and was approved for a 504 Individual Accommodation Plan.

Due to the drop in his state standardized test scores (NJ ASK), he was placed in Project Ahead upon entering South Orange Middle School for 6th grade. Project Ahead was a special program designed to support students struggling academically. Although

14

the program was supposed to help, the instructor failed to provide the proper guidance to A.J. and was non-communicative. Even though the School failed to adhere to its obligations under the IEP, the instructor held A.J. personally responsible for his lack of academic preparation and give him a failing grade. At the High School level, B.J. was forced to consistently petition teachers at the High School to meet their obligations under the IEP. To this day, A.J. has struggled due to the failure of the SOMSD to meet its obligations under the IEP and in accordance with federal law. As a result of the failure of the SOMSD to adhere to its obligations under an agreed IEP and in accordance with federal law, A.J. suffered harm.

12.        Defendant South Orange Maplewood School District is a governmental municipal School District created in the State of New Jersey and operating under its laws and at all relevant times, it employed the other defendants in this action.

13.        Defendants John and Jane Does 1-20 are past and present employees, past and present supervisory employees and/or past and present agents of the SOMSD, and/or its subdivision who acted individually and under color of State law, to wit, under color of statutes, regulations, policies, customs and usages of the State of New Jersey at all times relevant hereto.  This group also includes policymakers and may include Board members, who by their direct acts, have transcended their role as Board members and are considered state actors making day to day decisions.

14.     At all relevant times and in all their actions, the defendants acted under color of state law and pursuant to their authority as school district personnel.

# BACKGROUND

## I.    Racial Polarization in South Orange and Maplewood, New Jersey

### *1.  Using 'Diversity' to Preserve the Racial Status-Quo*

Since the Great Migration, African-Americans have been searching for communities in which they can experience true equality as Americans. Specifically, the desire for equal educational opportunities has driven African-American families to seek suitable communities in which to live. From the mid-20[th] century until the 1970s, African-Americans, by choice and consequence of public policy[1], settled in the nation's cities. Beginning in the 1970s, African-Americans began to filter into the suburbs to seek better opportunities for their children.  That exodus from central cities is now in full effect as the 2010 Decennial Census revealed that the majority of African-Americans now reside in suburban communities.

Maplewood[2] and South Orange[3], New Jersey are two of these suburban outposts. The two towns, given their racial diversity and relative affluence, should be the ultimate laboratory for successful racial integration and inclusion, but the experiment is failing. Instead, these two communities serve as a cautionary tale for African-Americans' expectations that life will be better in the suburbs.

> *"For blacks, in other words, high incomes do not buy entrée to residential circumstances that can serve as springboards for future socioeconomic mobility; in particular, blacks are unable to achieve a school environment conducive to later academic success. In Philadelphia, children from an affluent black family are likely to attend a public school where the percentage of low-achieving students is three times greater than the percentage in schools attended by affluent*

---

[1] *See* Massey, D.A, & Denton, N.S. American Apartheid: Segregation and the Making of the Underclass. P. 44. Harvard University Press, 1993. – "In making this transition from urban to suburban life, middle-class whites demanded and got massive federal investments in highway construction that permitted rapid movement to and from central cities by car."
[2] According to U.S. Census data, the Township of Maplewood has a population of 23,867, with African-Americans comprising 35% of the population. The median household income is $118,242.
[3] According to U.S. Census data, the Village of South Orange has a population of 16,198, with African-Americans comprising 28.7% of the population. The median household income is $116,727.

*children. Small wonder, then, that controlling for income no way erases the large racial gap in SAT scores. Because of segregation, the same income buys black and white families educational environments that are of vastly different quality."[4]*

The migration by African-Americans to suburban communities such as Maplewood and South Orange was considered a means to improve their quality of life. Specifically, an opportunity to improve educational outcomes for African-American children. In New Jersey, communities such as Teaneck[5] and Montclair in the north, and Willingboro in the south, were early suburban destinations in the 1960s for African-Americans seeking a better quality of life outside central cities.

In Essex County, where Montclair is also located, similar migratory patterns in Maplewood and South Orange did not take hold until the 1990s. By example, the 1970 Census shows African-Americans as 27% of the population in Montclair but only 3.4% of the population in South Orange. For the most part, real estate values and below-the-radar bias preserved the White identity of both Maplewood and South Orange for decades. The two communities had been safely ensconced White suburbs and were not impacted by the post-riot exodus from nearby Newark, as were neighboring East Orange, Orange and Irvington.[6] Though African-Americans had been present in both towns for some time, they were not a significant proportion of the population or significant enough to concern Whites. Where other communities such as Montclair and Teaneck began to confront issues around race as early as the 1960s, these issues were unspoken and of little concern in Maplewood and South Orange because neither town had a significant enough African-American population or African-American student population for issues that had festered for decades in the nation to be considered important to civic discourse. (See Historical Table of SOMSD Minority Student Enrollment attached hereto as **Table I**.)

---

[4] *Id.* P. 153
[5] *See* Damerell, Reginald G. *Triumph in a White Suburb*. William Morrow & Company, Inc. 1968 for an extensive accounting of the struggle to integrate the public schools in Teaneck, New Jersey. Teaneck has proclaimed itself the first community in the nation to voluntarily integrate its schools.
[6] According to the 1960 U.S. Decennial Census, nonwhites represented .9% of the population in Maplewood and 4.3% of the population in South Orange.

| African-American Proportion of Total Population[7] | | | | |
|---|---|---|---|---|
| Year | Maplewood | South Orange | Montclair | Teaneck |
| 1980 | 4.4% | 10% | 29% | 24% |
| 1990 | 12% | 19% | 31% | 26% |
| 2000 | 33% | 31% | 32% | 29% |

In other words, the African-American population in Maplewood and South Orange had not reached the infamous "tipping point" where Whites feel threatened.[8] Since the 1990s though, a wave of African-Americans has settled in both towns as middle class professionals have purchased homes after leaving Brooklyn, New York, Jersey City and Hoboken in New Jersey and other cities.[9] The period 1990-2000 represented a dramatic increase in the African-American population in Maplewood and South Orange. It is precisely the period when 'tracking' and 'leveling' was instituted with intensity in the local school district as the school district population began to reflect a larger African-American student population.

The "Two Towns," as Maplewood and South Orange self-identify in their marketing, boasts of their progressive character and have come to be identified as liberal bastions. The reputation is misleading. While residents revel in events touting 'diversity' and 'integration,' and seem to embrace a plethora of human interests – gender equality, LGBTQ rights, environmental justice, civil rights, religious freedom and more – this picture of progressive tranquility belies racial tensions driven by policing incidents, constant racial micro-aggressions in the public schools, White anxiety over the presence of large groups of African-American teenagers, and residential segregation.[10] These issues have festered for decades in both towns.

---

[7] U.S. Census
[8] By the early 2000s, the African-American population had increased significantly, including the presence of working class African-American families. At one point the African-American household income in South Orange exceeded that of Whites is both towns.
[9] The migration was spurred by the development of a commuter rail line, the Midtown Direct, on the New Jersey Transit system that connects riders from Maplewood and South Orange to Penn Station in mid-town Manhattan. The direct rail connection to Manhattan also caused a spike in real estate values in both communities.
[10] For almost 20 years the lights illuminating basketball courts in Maplewood's main park, Memorial Park, were turned off to prevent African-American youth from playing on the courts at night. The lighting on

The 'diversity' now present in Maplewood and South Orange is illusory, as African-Americans are still marginalized in the public-school district.[11]

> *"Critical race theorists point out that suburbanization was built upon a set of racist policies and practices that produced geographic spaces in which racial hierarchy and differential access to power have been carved out by policy over time. (Delgado & Stefancic, 2001; Ladson-Billings & Tate, 1995; Omi & Winant, 1994). Iglesias (2002) calls these racialized spaces, spaces that maintained racial hierarchies, that expanded the spaces of white domination and black oppression."[12]*

There is also an unequal financial burden placed upon African-American residents of the two towns. Like most states, public education in New Jersey is primarily funded by local real estate taxes. Maplewood and South Orange are two communities where residents' property tax assessments are considered high, even by New Jersey standards. African-American residents of Maplewood and South Orange pay high property taxes that are then used to subsidize the dis-investment in their children. For two decades, African-American parents, through the proportion of their tax assessment that is allocated to support the SOMSD, has watched their tax dollars support a school district that systemically discriminates against African-American students. Some African-American households foot the bill for private school for their children, and still pay high property taxes, due to concerns over the racial climate in the school district. These families are paying a "black tax" that is rooted in the racially discriminatory history of the SOMSD. To evade this penalty, some African-American residents choose to move out of Maplewood and South Orange, and that steady drip is becoming a stream, as data indicate.

---

adjacent tennis courts would fully illuminate those courts at night, while the basketball courts would be without illumination at night. This situation existed when there was no mechanical defect in the lights over the basketball courts.

[11] See Shiller, Jessica T. *The New Reality for Suburban Schools: How Suburban Schools are Struggling with Low-Income Students and Students of Color in their Schools.* p. 13. Peter Lang Publishing, Inc., 2016 – "Without access to power, there can be no real fundamental shift in how communities respond to issues affecting all of their residents. Rather it is possible to ignore issues that some residents face if they do not have power."

[12] Shiller, Jessica T. *The New Reality for Suburban Schools: How Suburban Schools are Struggling with Low-Income Students and Students of Color in their Schools.* p. 5. Peter Lang Publishing, Inc., 2016

The preservation of structural impediments targeting African-American students in the school district is intentional, and the results are discriminatory. This diverse and *progressive* community has knowingly supported, through its tax dollars, *de facto* segregated elementary schools and allowed academic tracking and leveling to segregate classrooms by race in its high school.   The acceptance of wildly divergent K-5 enrollments by race is tantamount to racial profiling, as is the racial disparities in advanced level courses in the high school. The South Orange-Maplewood School District (SOMSD) has engaged in a pattern of discriminatory practices for two decades and has exhibited little remorse for the harm caused African-American children and the denial of their constitutional rights. Thousands of African-American graduates of the SOMSD have received diplomas of lesser value than their White peers after being tracked into classes that lack the rigor and quality to facilitate college admission or employment at a wage suitable to sustain independent living. And, the larger communities of South Orange and Maplewood bear responsibility for this travesty.

2.   *Historical and Legal Background of School Segregation in New Jersey*

New Jersey's history with school desegregation is complex. Long before other states, the New Jersey legislature, in 1881, enacted a statute that prohibited racial segregation in schools.[13] The succeeding statute, 18A:38-5.1, passed by the state legislature in 1967, provides that "A member of any board of education who shall vote to exclude from any public school any child, on account of his race, creed, color, national origin, or ancestry shall be guilty of a misdemeanor, and punished by a fine of not less than $50.00 nor more than $250.00, or by imprisonment in the county jail, workhouse or penitentiary of the county in which the offense has been committed, for not less than 30 days nor more than six months, or by both such fine and imprisonment in the discretion of the court." In 1947, at the state constitutional convention, a new provision of the state constitution was adopted that specifically prohibits segregation in public schools.[14] New

---

[13] R.S. 18:14-2 (1881)
[14] N.J. Constitution. Article I. Paragraph 5.

Jersey is the only state in the nation with such a provision in its constitution that contains such an explicit prohibition against racial segregation in public education.[15]

Through the decades, state courts have intervened in efforts to desegregate New Jersey's public schools. The state Supreme Court in *Booker* (1965) erased any distinction between *de jure* and *de facto* segregation, and affirmed the benefits of children learning together at an early age.

> *"Whether or not the federal constitution compels action to eliminate or reduce de facto segregation in the public schools, it does not preclude such action by state school authorities in furtherance of state law and state educational policies. See Morean v. Bd. Of Ed. Town of Montclair, 42 N.J. 237, 242-244 (1964); Addabbo v. Donovan, supra, 256 N.Y.S.2d, at pp. 182-184; cf. Schults v. Bd. Of Ed. Of Township of Teaneck, 86 N.J. Super. 29 (App. Div. 1964), aff'd 45 N.J. 2 (1965). In a society such as ours, it is not enough that the 3 R's are being taught properly for there are other vital considerations. The children must learn to respect and live with one another in multi-racial and multi-cultural communities and the earlier they do so the better. It is during their formative school years that firm foundations may be \*171 laid for good citizenship and broad participation in the mainstream of affairs. Recognizing this, leading educators stress the democratic and educational advantages of heterogeneous student populations and point to the disadvantages of homogeneous student populations, particularly when they are composed of a racial minority whose separation generates feelings of inferiority.....It is heartening to note that, without awaiting further Supreme Court pronouncements, some states, including our own, have taken significant legislative or administrative steps towards the elimination or reduction of de facto segregation."[16]*

The Court's later ruling in *Jenkins v. Morris Township School District* (1971) resulted in the mandatory merger of the urban Morristown school district with the neighboring White, suburban Morris Township school district in 1973. The consolidation was ordered by the Court with the intent to achieve racially balanced schools and was predicated on the state constitution's anti-segregation provision and its education clause.

---

[15] See Greason, W.D. Suburban Erasure: *How the Suburbs Ended the Civil Rights Movement in New Jersey.* p. 80. Fairleigh Dickinson University Press. (2013) – "Noted historian of the African-American experience Giles Wright noted the passage of the 1947 New Jersey state constitution was a key factor in President Harry Truman's decision to desegregate the armed forces in 1948. In one generation, New Jersey had changed from a national leader in the maintenance of racial segregation to the vanguard of equal protection for all people."

[16] *Booker v. Board of Ed. of City of Plainfield,* 45 N.J. 161, 212 A.2d 1 (1965)

Now, 45 years into its existence, the merged school district is considered a model for its racial, ethnic and socio-economic diversity.[17] The Court surmised the benefits of the merged school district.

> "1. Establishment of a racial balance which represents the racial composition of the community. Bi-racial experience will be available in the early grades where it has important benefits for both white and Negro students in terms of interracial attitudes and preferences and at the later years where it appears to have important benefits to members of minority groups. 2. Representation of the socio-economic spectrum of the community at all levels of schooling. 3. Equal educational opportunity available to all students without regard to background, race, or residence..."[18]

There is a recognition, rooted in the state's history, that integrated education and heterogeneous learning environments are of value to children and society. Seventy-three years prior to our nation's highest court ruling on the incompatibility of segregation with the U.S. Constitution, legislators in New Jersey deemed the exclusion of students by race in public schools contrary to the public interest. New Jersey's efforts, though imperfect at times and stunted at others, serves notice to communities such as Maplewood and South Orange, that there is precedence for judicial intervention in school districts that support *de jure* **and** *de facto* segregation.

---

[17] Tractenberg, P., Roda, A., & Coughlan, R. (2016) *"Remedying School Segregation: How New Jersey's Morris School District Chose to Make Diversity Work."* The Century Foundation.
[18] *Jenkins v. Morris Twp. School District.*, 58 N.J. 483, 279 A.2d 619 (1971).

## FACTUAL ALLEGATIONS

### I.    De facto Segregation and Racially Disparate Tracking by South Orange-Maplewood School District

#### A.    SOMSD Has Maintained a System of De Facto Segregation

1.    Though the public schools are facially integrated, SOMSD K-5 schools are segregated and its high school is segregated by classes due to 'tracking' that occurs beginning in elementary schools, and 'leveling' that relegates African-American students to less rigorous courses beginning in middle school.

2.    For over two-decades, the SOMSD has been aware of a wide racial achievement gap that is rooted in the tracking of students as early as elementary school, and their subsequent assignment to courses in a hyper-leveled academic structure in high school.

3.    The district has also knowingly maintained a de facto system of elementary school enrollment in its K-5 schools (See Racial Profile of SOMSD Schools attached hereto as **Table III.**).  The SOMSD maintains six elementary schools, grades K-5. The schools are located throughout the communities of South Orange and Maplewood. The K-5 schools are Tuscan Elementary School, Clinton Elementary School, Seth Boyden Elementary School, South Mountain Elementary School, Marshall Elementary School and Jefferson Elementary School. The district also operates a Pre-K school, the Montrose Early Childhood Center. The district also has two middle schools, Maplewood Middle School and South Orange Middle School (6-8), and one high school, Columbia High School (9-12).

4.    Though both towns are racially diverse, there are pockets of segregation in Maplewood in an area in proximity to Seth Boyden Elementary School. Enrollment in elementary schools is by location of residence and limited choice, but one elementary school, Seth Boyden, was made into a demonstration school in an effort to improve student performance. The district does not provide bussing for students and most students

arrive by car; though many walk, because the neighborhoods are relatively compact and zoned in such a way that schools are in walking distance for most families.[19]

5.     Recent data compiled by a local civic group revealed that after a 20-year period of increased integration, both South Orange and Maplewood were reversing course and becoming Whiter in population[20]. This change is also affecting the public schools as is evidenced by a noticeable decrease in the African-American student population in Columbia High School. While there is no one explanation for this trend, it is known that for some time Black middle-class parents were removing their children from the public-school district and exercising other educational options. This 'Black flight' has been attributed to dissatisfaction with the local schools based upon an awareness of the difficulties Black children face in the district's schools. While the exodus occurs at all levels, it is most pronounced during the middle school years when Black parents remove their children in advance of matriculation in Columbia High School. This is in addition to the White-flight that has been occurring for some time. As White children finish their elementary or middle school education in-district, they are then enrolled in significant numbers in schools outside the SOMSD.[21]

6.     Despite the diversity of the two towns, the school district maintains a de facto segregated system of elementary education. According to state data[22], the enrollment in Seth Boyden is 63.9% Black, 7.4% Hispanic, and 7.4% Hispanic, while White students comprise 22.5% of the school population. These numbers compare to **Clinton**, <u>21.9%</u>

---

[19] Seth Boyden Elementary School, Clinton Elementary School and Tuscan Elementary are each within 1.4 miles between each school in Maplewood. The distance between Marshall Elementary School and Jefferson Elementary School is within 2.2 miles in South Orange. At the farthest extreme, the distance between South Mountain Elementary School in South Orange and Seth Boyden Elementary School in Maplewood is 2.8 miles.

[20] A local civic group, The South Orange-Maplewood Community Coalition on Race, commissioned a study, <u>Demographic Changes in South Orange and Maplewood</u>, on demographic trends in South Orange and Maplewood and reported in 2017 that its findings indicate that the proportion of the White populations of the two towns is increasing. Among the findings are the Black share of mortgages in South Orange and Maplewood has fallen from 22% in 2007 to 9% in 2013. There is also a trending income gap between Whites and Blacks in the two towns, a reversal from 2007 when Black income in South Orange exceeded White income.

[21] SOMSD Board members have children attending school out of district, including one of the African-American members.

[22] New Jersey School Performance Report, 2016-2017. New Jersey Department of Education

Black, 56.8% White and 9.8% Hispanic and 6.5% Asian; **Tuscan**, 14.7% Black, 68.1% White and 8.3% Hispanic and 2.6% Asian; **South Mountain**, 16.7% Black, 63.7% White and 7.1% Hispanic and 4.5% Asian; **Marshall**, 17.9% Black, 62.8% White and 6.6% Hispanic and 4.0% Asian; and **Jefferson**, 23.1% Black, 60.4% White and 5.8% Hispanic and 3.5% Asian. The Montross Early Childhood Center is 42.5% White, 28.3% Black, 13.3% Hispanic and 4.4% Hispanic.

7.    The districts two middle schools are predominantly White, with nearly identical enrollment by race and ethnic group. The demographic profile of Columbia High School shows a more balanced population of White and Black students (47.9% and 41.7% respectively), with Hispanic students at 5.5%, and Asian students at 3.4%. Despite the fact that neither White or African-American students are in the majority, classes in Columbia High School are segregated by race. It is noteworthy that over the last four years the number of African-American students has dropped significantly. The 2012-13 state School Performance Report indicates at that time African-American students represented 51.9% of the high school's enrollment. This decrease in African-American representation is also reflected in trends in the two communities.

8.    The district has failed to advance a credible plan to desegregate its elementary schools, though fully aware of housing patterns in the two communities, the exodus of Black students from the district and data that shows the two communities are reversing course on integration. This lack of attentiveness has led to one elementary school being overwhelmingly Black and the five other overwhelmingly White.[23]

9.    This racial imbalance robs children in the community of the opportunity to benefit from the diversity of the two towns, gain a greater appreciation for the diversity of their community, and learn how to live alongside people of varying cultures, faith and ethnic

---

[23] The neighborhood (deemed the 'Hilton' neighborhood locally) that approximates Seth Boyden Elementary School is predominantly African-American. The school sits on Boyden Avenue, south of Springfield Avenue, a commercial corridor that serves as the traditional 'railroad tracks' that demarcate White and Black neighborhoods in many communities.

backgrounds. It is particularly inexcusable when one considers that Maplewood is only 3.88 square miles and South Orange just 2.86 square miles.

> "Children attending public school, similarly, are also attending segregated schools. Orfield and Frankenberg (2012) argue that schools have resegregated. These schools not only have unequal access to educational resources, but attending segregated schools makes developing empathy, reversing stereotypes, and building cross-cultural understanding more difficult (pp. 18-19). In an increasingly diverse society, what Orfield and Frankenberg call the "resegregation of schools" may have very negative consequences."[24]

10.     The segregated nature of elementary education in SOMSD also leads to a problem of lack of sensitivity by the district itself and/or the dominant population group. One such episode occurred in South Mountain Elementary School when a 5th grade social studies assignment had children drawing slave auction posters.[25] The posters depicted Black children enslaved and were displayed throughout the school. In another school, Jefferson Elementary School, in one class, where a substitute teacher was in place, children on their own made a video of a slave auction in which a Black classmate was sold into slavery.[26]

11.     While this incident would have been regretful at any elementary school in the district, it was particularly painful in a K-5 school that is overwhelmingly White. In response, rather than address the glaring deficiency in the K-5 curriculum, the Board of Education pursued changes in the middle school curriculum.[27]

---

[24] Shiller, Jessica T. *The New Reality of Suburban Schools: How Suburban Schools are Struggling with Low-Income and Students of Color in Their Schools.* p. 11. Peter Lang Publishing, Inc., 2016.
[25] *Elementary students hold mock slave auction during class.* The Star-Ledger. March 20, 2017.
[26] *"Another 'Slave Auction' School Project Reported in South Orange-Maplewood."* Patch.com. March 20, 2017 – https://patch.com/new-jersey/maplewood/another-slave-auction-school-project-reported-south-orange-maplewood
[27] *"Davis Ford: 'We Must Do Better' Teaching African-American History."* VillageGreenNJ.com April 1, 2017 – http://villagegreennj.com/salon/davis-ford-must-better-teaching-african-american-history/ Note: Deborah Davis-Ford is the sole African-American member on the South Orange Village Board of Trustees, the governing body for the town.

12.     This incident brought to light SOMSD's failure to implement the state mandated African-American History curriculum.[28] This omission is consistent with the devaluing of African-American culture that successive cohorts of high school students have protested. In 2017, two Columbia High School students were called out for an Instagram photo in which they appeared in blackface, with one student with their middle finger extended and the photo caption "Dude with his [N*****]."[29] The incident recalled previous incidents of racial insensitivity and how festering beneath what appears as a racially 'diverse' community are negative attitudes and perceptions of African-Americans.

13.     Over the last two-decades the SOMSD has experienced bad management, exemplified by poor decision-making, that has led to these issues and others that affects the quality of the educational experience of many students.

14..    The instability of leadership of the SOMSD, that can be attributed to festering and unresolved grievances, has contributed to uncertainty and doubt that SOMSD, on its own, can fulfill its legal obligations to children in its schools. Since 2000, SOMSD has had five superintendents and five principals at Columbia High School.[30] Over the last few years a large number of teachers have left the school district, and their departures are not tied to retirement. In the last year alone, there has been an exodus of teachers from the SOMSD.

15.     In addition, the Board of Education has made several glaring missteps as the stewards of the school district. The Board of Education failed in implementing the International Baccalaureate (IB) program at the high school level after expending significant resources and personnel hours. The IB fiasco was a failure of execution that

---

[28] The New Jersey Amistad legislation (Assembly Bill. No. 1301) was sponsored by Assemblymen William D. Payne and Craig A. Stanley and became law in 2002. The bill created the Amistad Commission and the mandate to implement an African-American history curriculum in the state's public schools.

[29] *"NJ Students Make Instagram Posts, 'Blackface' and Anti-Semetic: Reports."* Patch.com. May 6, 2016 – https://patch.com/new-jersey/maplewood/nj-students-make-racist-instagram-posts-blackface-anti-semetic-reports-0

[30] Superintendents serving were Dr. Peter Horoschak, Dr. Brian Osborne, Jim Memoli (Interim), Dr. John Ramos and Dr. Thomas Ficarra (Interim). Serving as Principal of Columbia High School has been Dr. Robinson, Ms. Renee Pollack, Mr. Kirk E. Smith (Interim), Dr. Lovey Lillie, and Ms. Elizabeth Aaron.

was plagued from the outset by poor communication, teachers' push back over their lack of input, and no clear vision on how the curriculum would be incorporated into the district's existing alignment of courses. This episode also highlighted a larger failure by SOMSD to keep curricula up-to-date. A similar example of the SOMSD's Board of Education's questionable stewardship was an attempt to win public support for the construction of a multi-million-dollar aquatic center to replace an aging pool that is in disrepair at Columbia High School, a building in need of major renovation throughout.[31] To justify the project and sway public opinion, the Board of Education suggested the pool was necessary because most African-American children could not swim and that swimming was a critical life skill. The project was killed after much public criticism.

16.     The SOMSD has also been derelict in the maintenance and upkeep of its buildings. There was a public uproar in some parts of the community when environmental testing revealed high levels of lead in the drinking water at the elementary school with the largest population of African-American students, Seth Boyden Elementary School. Most of the district's schools are in disrepair and require renovation. Columbia High School, considered an architectural jewel when it opened in 1927[32], is in need of major reconstruction and is mice infested. Students at several schools are assigned to portable trailers and have been for decades. These trailers present a health and security risk and are not compliant with state regulations.

17.     The accumulative effect of these management failures is the inability of the SOMSD to focus on what should be its priority – its students. The dysfunction of the district ultimately harms the students most in need and the students historically disadvantaged – special needs students and African-American students.

17.     Segregation in the district also creates a resource disparity between elementary schools. With much of a school's programming outside the classroom supported through

---

[31] *"SOM District Considers Building Aquatic Center at High School."* Patch.com. October 16, 2012 – https://patch.com/new-jersey/maplewood/school-district-may-build-aquatic-center-at-high-school
[32] Columbia High School: Birth of a Building. jamesbetelle.com. http://jamesbetelle.com/2006/09/09/columbia-high-school-birth-of-a-building/

the voluntary and monetary contributions of parents, the sole elementary school with a majority Black population is under-resourced relative to other schools.

18.     With the nation now 50 years past the defining U.S. Supreme Court desegregation mandate in *Brown v. Board of Education*, what has transpired in the SOMSD betrays that historic ruling and casts doubt on the ability or willingness of our nation's public schools to fully embrace equity. The question in *Brown* was the segregative effects of *"separate but equal"* and the question in 2018 in the SOMSD is the equally segregative intent of *"equal but separate."* If communities with the diversity and reputation of Maplewood and South Orange cannot be trusted to educate African-American children, there is little hope that significant progress can be made. This school district has all of the requisite elements to be a national model of excellence through equity but it consistently violates state and federal law, and puts at risk the futures of African-American children.

> *"Even the Supreme Court, despite its original courage and integrity, curbed itself only a year after the 1954 landmark cases, when it handed down its Pupil Placement decision, in effect returning to states the power to determine the tempo of change. This subsequent decision became the keystone in the structure that slowed school desegregation down to a crawl. Thus America, with segregationist obstruction and majority indifference, silently nibbled away at a promise of true equality that had come before its time."[33]*

### B.     History of 'Ability Grouping' and 'Leveling'

1.     'Leveling' or 'Ability Grouping' is the practice of assigning students to classes based upon their perceived capabilities or some form of testing.

> *"Academic tracking "is the educational practice of categorizing students by curriculum." The practice involves separating students – ostensibly on the basis of "ability" – into different "tracks," "levels," or "groups," with distinct or differentially placed curriculums. The typical model involves three tracks: (1) "slow or vocational"; (2) "average or general"; and (3) "fast or academic." In most districts that track, students are placed based on a combination of three criteria: (1) standardized test scores; (2) "teacher and counselor*

---

[33] King, Martin. L. *Where Do We Go From Here: Chaos or Community?* p. 11. Beacon Press, 1968.

*recommendations (including grades)"; and (3) "students and their parents' choices." While this practice is facially race-neutral, its effect is not. When tracking is employed in a diverse district, students become racially segregated, with white students being placed disproportionately in "fast or academic" tracks and students of color being largely relegated to "slow or vocational" tracks."[34]*

2.      Research (See Bibliography attached hereto as **Exhibit C**.) has largely discouraged this practice as neither helpful to low-achieving students or high-achieving students. The nation's largest teachers' union, the National Education Association (NEA), and other groups, have passed policies or issued statements opposing the use of ability grouping.[35] The literature suggests that heterogenous grouping of students in the classroom can improve the academic performance of students at the low end of the achievement scale while not impeding the progress or performance of students with demonstrated high ability.[36] The creation of heterogeneous classrooms provides a secondary benefit. The mixing of students helps facilitate the socialization process, prepares students for a multi-cultural society, and lessens the development of biases formed when individuals have no experience with people outside their immediate racial, ethnic or gender grouping.

---

[34] Kasten D. (2013). *Modern Day School Segregation: Equity, Excellence, and Equal Protection.* p. 202. St. John's Law Review Volume 87, No. 1

[35] *See* Welner & Oakes, (1996). *(Li)ability Grouping: The New Susceptibility of School Tracking Systems to Legal Challenges.* pp. 452-453. Harvard Educational Review. Vol 66. No. 3. - "Policy makers have reacted to the mounting empirical evidence against the fairness and the educational efficacy of ability grouping by increasingly joining the ranks of those opposing the practice. For example, the National Governors Association has published a report entitled *Ability Grouping and Tracking: Current Issues and Concerns* (1993), in which the organization firmly stated its opposition to school tracking. Similarly, the Carnegie Council for Adolescent Development's *Turning Points: Preparing American Youth for the 21st Century* (1989) has identified detracking as central to reforming middle grades education. Also, The College Board has criticized the role of tracking in imposing barriers to minorities' access to college. (Goodlad, 1989). One goal of The College Board's Equity 2000 project is to eliminate mathematics tracking in high schools."

[36] *See* Danielle Kasten, *Modern Day School Segregation: Equity, Excellence, and Equal Protection*, St. John's Law Review, p. 210. Volume 87, No. 1 - "Yet, the research consistently shows that tracking itself significantly contributes to the racialized achievement gap. In fact, districts that have detracked have dramatically narrowed the achievement gap between white and minority students in their districts. And research in districts that continue to track has demonstrated that -even in the present day – race, and not ability or achievement, is often the defining factor in track placement. So, why in the twenty-first century, do schools continue to track, despite the evidence? One junior high school teacher put it this way: "Quite frankly. I think the reason we have honors is parental pressure. It's a racial issue. An honors group is a white group."

3.     Scholars have noted the harmful effects of academic tracking and 'ability grouping' and how the practice is rooted in efforts to preserve white, homogenous classrooms to the disadvantage of African-American and Latino students. Welner and Oakes point out the direct link between progress in school desegregation following the historic U.S. Supreme Court decision in *Brown v. Board of Education* (1954) and the use of new tactics, such as tracking, to oppose integration in public schools.

> *"One of the most enduring remnants of this era, however, is the expanded use of ability grouping, also known as tracking, to maintain racial segregation (Oakes, 1985). Since that time. Mounting evidence has demonstrated that tracking is pedagogically ineffective and subject to abuse by those who would racially discriminate. Research has convincingly demonstrated that tracking of our school children is poor pedagogical practice (Murphy & Hallinger, 1989; Oakes, Gorman & Page, 1992; Slavin, 1987). Related research has shown that tracking disproportionately harms students from non-White backgrounds (Moore & Davenport, 1988; National Center for Educational Statistics, 1985; Oakes, 1985, 1990, 1992; Oakes et al., 1992). Yet, tracking persists."* [37]

4.     Tracking is rooted in systemic racism and institutional bias and originated as a means to perpetuate existing White privilege to limit the opportunities of certain racial and ethnic groups. Losen (1999) notes the historic origins of the practice of tracking.

> *"Ability grouping was originally instituted in our public schools with the goal of limiting participation by certain racial and ethnic groups. During the period between 1920 and 1950, the concept of "giftedness" in the educational setting was most noticeably expounded by Lewis Terman. Terman, who is credited with importing the Stanford-Binet IQ test to America, and giving it "hereditarian" interpretation, traced the "development of high-IQ children from their childhood in the 1920s to mid-life and beyond," urging the use of ability grouping to keep certain ethnic groups separated from Anglo-Americans in school."* [38]

5.     Tracking has now become racially defined as African-American and Latino students often find themselves walking in the same school door with their White peers,

---

[37] Welner, K & Oakes, J (Fall 1996). *(Li)ability Grouping: The New Susceptibility of School Tracking Systems to Legal Challenges.* p. 452. Harvard Educational Review, Volume 66, No 3.
[38] J Losen, D. (1999) *Silent Segregation in Our Nation's Schools.* pp. 520-521. 34 HARV. C.R.-C.L. L. REV. 517, 520

but then being channeled into separate classrooms.[39] The racial integration in public schools that many were hopeful would evolve after *Brown* has met White resistance. Even in racially mixed and so-called 'progressive' communities like Maplewood and South Orange, New Jersey, tracking has been deployed and accepted as a tool to differentiate classrooms by race. It is not subtle. It is blatant and defended by many Whites who publicly express support for 'diversity' while opposing the integration of classrooms. The failure to integrate schools and classrooms derives children of an important benefit in their maturation.[40]

6.     The use of tracking and leveling is not a necessity, but rather, a choice. Tracking and leveling are ineffective mechanisms to close the racial achievement gap. These practices have been proven harmful to African-American and Hispanic students, and research and alternative strategies have confirmed there are better ways by which to elevate academic achievement among students of color.[41]

7.     The OCR complaint filed by the ACLU and the UCLA Civil Rights Project pointed out the research concludes the negative effects of tracking on equity.

---

[39] *See* Howard, J. (1995) *You Can't Get There from Here: The Need for a New Logic in Education Reform.* Pp. 87-88. Daedalus. Fall 1995. The Journal of the Academy of Arts and Sciences. – " "Sort children by judgments of learning capacity; separate the bright from the dull." *This* is the fundamental operating principle of our education program, the imperative that drives norm-referenced testing, tracking, ability grouping, gifted and talented programs, and all the rest. Practices explicitly designed to exclude millions from rigorous education seem entirely reasonable if you believe the requisite abilities to be unequally distributed. By now five generations have received this treatment; we have come to accept it as a fundamental aspect of "the way things are." Most Americans are so well indoctrinated that we meekly acquiesce in the practices of judging and sorting, even when negative judgments and inferior group assignments are delivered on our own children. Our teachers were socialized in our institutions too, and learned to regard the traditional practices as *logical* – perfectly aligned with culturally validated beliefs about intelligence."

[40] *See* Flaxman & Kuscera, Orfield, Ayscue, Siegel-Hawley, (2013). *A Status Quo of Segregation: Racial and Economic Imbalance in New Jersey Schools, 1989-2010.* p. 17. The Civil Rights Project - "In terms of social outcomes, racially integrated educational contexts provide students of all races the opportunity to learn and work with children from a wide array of backgrounds. These settings foster critical thinking skills that are increasingly important in our multicultural society – skills that help students understand a variety of different perspectives. Integrated schools also are linked to a reduction in students' willingness to accept stereotypes. Students attending integrated schools also report a heightened ability to communicate and make friends across racial lines."

[41] See Irvine, J. J., *Black Students and School Failure.* pp. 97-98. Praeger Publishers. 1990 – The author cites three alternative academic models to tracking, Mortimer Adler's *Paideia Proposal* that calls for a one-track system for all students, Jeannie Oakes' model of reorganizing schools that similar students are not grouped together for instruction, and Combs' and Kohn's *Cooperative Learning* approach.

> *"While the body of research on ability grouping/tracking varies in certain respects, three consistent groups of studies and conclusions have emerged. The first group of studies compares ability grouped and non-ability grouped classes showing no effect on learning when grouped with differentiated curriculum. The second group of studies compared high-track and low-track classes with differentiated curriculum, indicating that low-track students learned less than their high-track peers. Thus, compensatory programs meant to help low-level students "catch-up" do not achieve their goal and result in discouragement and lower outcomes for students in lower levels. The final group of studies addressed the impact of high track curriculum. As expected, high-level students benefitted from enriched curriculum, but research also showed that low and middle-track students (included by either design or administrative accident) benefitted from the same curriculum. Synthesizing these studies, ability grouping, at best, benefits high-level students without any benefit to low-level students. At worst, ability grouping serves to widen the achievement gap. The minimal benefits do not outweigh the social and diversity costs."[42]*

8.    School districts that are similarly populated and have similar socio-economic profiles as the SOMSD have embraced heterogeneous classrooms and all students have benefited; particularly African-American students. The Rockville Centre school district in Long Island, New York, under the stewardship of longtime Superintendent Dr. William Johnson, has gained a national reputation for its success in de-tracking its schools. The district's high school, South Side High School, formerly under the leadership of equity champion Dr. Carol Burris[43], closed its achievement gap by implementing a rigorous curriculum, placing high expectations upon all students, providing the necessary supports to help students achieve, and holding teachers accountable for the progress of their students.[44] The same high expectations are placed upon students in the Montgomery

---

[42] *Complaint against the South Orange Maplewood School District under Title VI of the Civil Rights Act of 1964 and Section 504 of the Rehabilitation Act of 1973.* ACLU-NJ & The Center for Civil Rights Remedies at The Civil Rights Project. October 9, 2014.

[43] Dr. Carol Burris is heralded for her work in detracking the curriculum of South Side High School in the Rockville Centre, Long Island New York School District, and closing the racial achievement gap. She is the author of *On the Same Track: How Schools Can Join the Twenty-First Century Struggle Against Resegregation* (2014) and the co-author of *Detracking for Excellence and Equity* (2008). Dr. Burris has also authored numerous scholarly papers on the subject of academic tracking and ability grouping. In *On the Same Track: How Schools Can Join the Twenty-First Century Struggle Against Resegregation,* Dr. Burris suggests "Tracking is the sorting of students within a school or district that results in different access to academic curriculum and the opportunity to learn."

[44] In 2014, the Black Parents Workshop led a delegation of SOMSD Board members and administrators on a fact-finding visit to South Side High School.

County, Maryland school district where students of all races enrolled in James Hubert Blake High School excel while taking on rigorous courses.[45]

9.      Opposition to ending tracking has come from White parents and some teachers. White parents raise the specter of 'lowered standards' or loss of academic rigor as a defense of rigid ability grouping.[46] In addition, White parents often point to the 'family life' of African-American students as a scripted and coded proxy to label Black children as unprepared for the rigor of advanced-level course work. This is often heard when White parents suggest socio-economic factors not race is at the root of racial disparities and the achievement gap.[47]

10.     Teachers too have been known to advance the same theory regarding the underachievement of African-American students, and their disposition toward these students often reflect that bias.[48] The absence of significant numbers of African-American teachers in the SOMSD contributes to the disproportionality of White students in advanced courses (See Racial Composition of SOMSD Staff attached hereto as **Table III**.)[49] Grissom and Redding (2016) note how teachers' perceptions affect the assignment of students to gifted programs.

---

[45] James Hubert Blake High School in Silver Spring, Maryland has the third highest college enrollment rate, 82%, for African-American students in all Montgomery County public high schools. The Black Parents Workshop visited Blake High School on February 13, 2018.

[46] *"Resident Asks BOE What Is Being Done for High-Achieving Students."* Patch.com. July 20, 2010.

[47] See Posey-Maddox, L. (2016) *Challenging the Dichotomy Between "Urban" and "Suburban" in Educational Discourse and Policy.* pp. 226-227. The Educational Forum. Volume 80. – "The issues faced by Black families in suburbia are not simply about socioeconomic disadvantage, as studies show that middle-class Black students and their families commonly face low teacher expectations, assumptions of Black student deviance, and stereotypes about Black family life and levels of parental involvement (Allen, 2013; Gordon, 2012; Howard & Reynolds, 2008; Lewis-McCoy, 2014)."

[48] See Wiley K., Shircliffe, B. & Morley J. (2012) *Conflicting Mandates Amid Suburban Change.* The Resegregation of Suburban Schools. p. 150. (Frankenberg E. & Orfield, G. eds) Harvard Education Press. – "District teacher and department head Steve Davis says resistance to opening up AP is not uncommon, and that resistance has racial overtones: "You could call it a race issue. I'm not saying teachers are racist, but [it's] under a guise of 'this person can't read." He additionally notes that resistance is wrapped up in worries about pass rates on exams administered to AP students: "It's the exam, it's the pass rate; [teachers are] worried about the pass rate, and particularly now with the way school grades are changing to incorporate AP participation into the state grade.""

[49] On April 25, 2017, the Black Parents Workshop arranged a meeting between the Assistant Superintendent of the SOMSD and senior staff at the School of Education and Urban Studies at Morgan State University, a historically Black college in Baltimore, Maryland. Morgan State University expressed an interest to assist SOMSD in creating a pipeline for African-American alumni in the School of Education

*"Researchers have identified teacher discretion in the gifted assignment process as a potentially important contributor to this inequity. Because the process often begins with teacher referral, classroom teachers can play a gatekeeping role in gifted assignments (Donovan & Cross, 2002). Reliance on teacher referrals can disadvantage students of color if teachers hold low expectations for them or are less likely to recognize giftedness in such students (Elhoweris, Mutua, Alsheikh, & Holloway, 2005; Ford & Grantham, 2003)."*[50]

11.     Where 'leveling' or 'ability grouping' has been used in school districts across the nation, the outcome has generally been the segregation of low-income, African-American and Latino students in less demanding or remedial courses.[51] The 'tracking' of students into lower-level and inferior courses has been a principal driver of the much-discussed racial achievement gap. This pattern has been identified by two successive presidential administrations as likely violative of federal law.[52] Students who are denied access to rigorous courses are materially harmed by the deficit that occurs in their learning, and their being unprepared for college admission or employment. Studies have revealed the

---

and Urban Studies to teach in the district. Despite the interest on the behalf of Morgan State University, little has been done to follow-up on the meeting. In defense of the dearth of African-American teachers one SOMSD Board member, Madhu Pai, took to social media and claimed African-American male teachers are so scarce they are like "unicorns."

[50] Grissom, J. & Redding, C. (2016). *Discretion and Disproportionality: Explaining the Underrepresentation of High-Achieving Students of Color in Gifted Programs.* pp. 1-2. AERA Open. Volume 2, No. 1

[51] *See* Kasten, D. (2013). *Modern Day School Segregation: Equity, Excellence and Equal Protection. p. 206. St. John's Law Review.* Volume 87, No. 1. – "Moreover, there is evidence indicating that tracking was intentionally used as a segregative tool. The belief that students of color had inferior innate intellectual abilities persisted into the 1960s. In fact, the belief was so strongly held that legislators in at least one state considered passing a resolution "that would support a contention that Negroes are inferior to whites in innate ability and that therefore segregation is scientifically supportable."

[52] The U.S. Department of Education Office of Civil Rights (OCR) issued a "Dear Colleague" letter to local education authorities (LEAs) on December 26, 2007 advising school districts of complying with Section 504 of the Rehabilitation Act of 1973 and its implementing regulations at 34 CFR Part 104 pertaining to obstructing students with disabilities from enrolling in Advanced Placement and International Baccalaureate classes or programs (accelerated programs). On May 22, 2008 the U.S. Department of Education Office of Civil Rights (OCR) under the administration of President George W. Bush issued a "Dear Colleague" letter to local education authorities (LEAs) providing guidance on possible violations of Title VI of the Civil Rights Act of 1964 regarding access to Advanced Placement (AP) courses. On October 1, 2014 a "Dear Colleague" letter was issued by the U.S. Department of Education Office of Civil Rights (OCR) under the administration of President Barack Obama to local education authorities (LEAs) providing guidance on complying with anti-discrimination and desegregation laws, as well as access to advanced courses and gifted programs.